**WYNNEWOOD DEVELOPMENT COMPANY, Appellant,**

v.

**James BELMARES, Appellee.**

**No. 3244.**

Court of Civil Appeals of Texas.

Eastland.

Oct. 19, 1956.

Rehearing Denied Nov. 16, 1956.

Wynne & Wynne, Dallas, for appellant.

Biggers, Baker, Lloyd & Carver, Dallas, for appellee.

LONG, Justice.

James Belmares sued Wynnewood Development Company for breach of an alleged oral contract. Belmares alleged that on February 8, 1954, he entered into an oral contract with the development company to do all of the plastering and lath work on the Medical and Professional Building in the Wynnewood shopping village in Dallas, Texas. He further alleged that the development company refused to permit him to do said work and thereby breached said contract to his damage. Based on a jury verdict, judgment was rendered in favor of Belmares for $4,000, damages for said breach. The development company has appealed.

The evidence discloses .that appellee Belmares on February 8, 1954, and for many years prior thereto had been doing

plastering and lath construction as a contractor; that appellant Wynnewood Development Company on said date had under construction the Medical and Professional Building in the Wynnewood Subdivision in Dallas, Texas. Prior to February 8, 1954, appellant and appellee entered into negotiations regarding the plastering and lath work in said building. Appellee testified that a few days prior to said date he submitted a bid on the plastering and lath work to be done in said building at a price per unit yard. Appellee further testified that on the 8th day of February, 1954, at the request of appellant, he went to the field office of the appellant near the Wynnewood Medical and Professional Building and had a conversation with the agents of the appellant relative to said bid. As to what occurred on that occasion, appellee testified as follows:

"Q. All right; now when is the next time you had any contact or any conversation or dealings with Mr. Lance or Mr. Clark of the Wynnewood Development Corporation? A. On Monday morning—that was the next Monday after the last conversation I had with Mr. Clark on the phone—I believe it was the 8th day of February, it was about seven o'clock, Mr. Lance, the job superintendent, called me at my house in the morning and he said, 'Jimmy'—he called me Jimmy—he said, 'I would like for you to come down to the office. We are going to give you the plastering job.' So he said he wanted to meet me—him and Mr. Clark, they would meet me at nine o'clock that morning in their office. I said, 'All right, sir, I will be over there.' So I called my lathing contractor and he came with me, and then again we went to the field office of the Medical Building, and I came inside and Mr. Lance and Mr. Stevens—he was the architect inspector on the job,—well, I said, 'Good Morning.' Mr. Stevens said, 'Mr. Clark will be here after a few minutes.' I said, 'All right.' So

Mr. Lance said, 'We had better go over these figures you gave me the last time to see that everything is all right, while Mr. Clark is getting here.' So he took out that notation he made that time—the first time I came to the field office, and we went over it.

"Q. Went over all the figures that had already been submitted? A. Yes, sir. And he said, 'Well, I guess everything is satisfactory.' He said, 'We've decided to give you the job, but Mr. Clark will be here to tell you.' At that moment Mr. Clark came in the field office. He said, 'Good Morning, Jimmy.' I said, 'Good Morning, Mr. Clark.' He said, 'I haven't heard nothing but good about you,' he said, 'so I've decided to give you the plastering job.' I said, 'Thank you very much, sir.' He said, 'I am not going to be too hard on these payments. As the job progresses we are going to give you your estimates as you call for them, less ten percent every week. The reason for that is because we don't have all the floor space rented and as we rent the floor space, we will be paying you for your work until the building is completed. Then we will pay you all your percent that has been retained.'

"Q. All right. And at that time it is your testimony that you and Mr. Clark discussed the amount that was to be paid for the work and how the work was to be performed? A. Yes, sir.

"Q. Was there any other discussion about anything else that had to be done, as far as you were concerned? A. Well, Mr. Clark said that he was busy just at the moment; that is all he had to say. He said, 'You go with Mr. Lance over in the building and see what is to be done. I am just busy this morning.' And he walked away from his office, and he left."

On cross-examination appellee admitted that Mr. Clark, the agent of appellant, told

him on that occasion he would like to have a written contract. There is evidence that thereafter appellant repudiated said contract and without any legal right refused to permit appellee to carry it out. The jury found in answer to special issues that appellant on February 8, 1954, accepted the bid of appellee to perform the plastering and lath work; that it was not the intention of the parties that their agreement should be reduced to writing and signed by the parties before it became binding.

 The court submitted the following special issues to the jury:

"Special Issue No. 3

"Do you find from a *preonderance* of the evidence that James Belmares sustained any loss by reason of his not being permitted to perform the plaster and lath work on the Wynnewood Medical & Professional Building?

"Answer 'Yes' or 'No.' Answer Yes

"If you have answered special issue No. 3 'Yes', then answer special issue No. 4. Otherwise, do not answer special issue No. 4.

"Special Issue No. 4

"What amount of loss, if any, do you find from a preponderance of the evidence has James Belmares sustained in the past, if you find he has sustained any in the past, by reason of not being permitted to perform the plaster and lath work in the Wynnewood Medical & Professional Building?

"Answer in dollars, if any, and cents, if any.

"Answer $3,000.00

"If you have answered special issue No. 3 'Yes', then answer special issue No. 5. Otherwise, do not answer special issue No. 5.

"Special Issue No. 5

"What amount of loss, if any, do you find from a preponderance of the evi-

dence will James Belmares reasonably sustain in the future, if you find that he will sustain any in the future, by reason of not being permitted to perform the plaster and lath work on the Wynnewood Medical & Professional Building?

"Answer in dollars, if any, and cents, if any.

"Answer $1,000.00"

By its point number five appellant urges the trial court erred in submitting special issues 3, 4 and 5 because said issues misapply the legally correct measure of damages. This point is sustained. Appellant objected to each of said issues on the ground that the only loss claimed by the plaintiff was a loss of profit on this job and these issues allow the jury to speculate on other losses. This exception to the charge should have been sustained. The only damage sought by appellee was loss of profit. In our opinion the court erred in failing to meet the exception leveled to the charge for the reason that the issues submitted allow the jury to speculate and to take into consideration other losses the appellee might have sustained besides profit. The jury was given no guide to measure the loss sustained by appellee. There was evidence that appellee was injured by reason of his believing he was to receive the contract and was thereby prevented from bidding on other jobs. The contract in question would have required the services of fifty to one hundred men. There is evidence that appellee put forth some effort in obtaining these men. There is evidence that appellee ordered a carload of material as soon as he was told he had been given the contract. Under the charge there was nothing to prevent the jury from considering all these matters in determining the loss sustained by appellee. It is the settled law that the proper measure of damage for the breach of a contract such as we have here is the net profits appellee would have made had the contract been carried out. In other words, the gross contract proceeds less the cost to appellee in doing the work is the

proper measure. Harlingen Independent School Dist. v. C. H. Page & Bros., Tex. Com.App., 48 S.W.2d 983. It can readily be seen that the court's charge did not confine the jury to this measure of damage, but left it free to speculate on and consider other losses.

By other points appellant complains of the court's charge, but we are inclined to the opinion that the exceptions made by appellant are not broad enough to raise the questions. We have considered all other points raised by appellant and find no merit in them and they are, accordingly, overruled. The judgment of the trial court is reversed and the cause remanded.